UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KEY SAFETY SYSTEMS, INC.,

               Plaintiff,

                                      Case No. 08-CV-10558

vs.

                                        HON. GEORGE CARAM STEEH

INVISTA, S.A.R.L., L.L.C.,

               Defendant.

_____/

ORDER GRANTING IN PART AND DENYING IN PART
KEY SAFETY SYSTEMS, INC.'S MOTION FOR PRELIMINARY INJUNCTION

     This is a breach of contract action which arises out of defendant Invista,

S.A.R.L.'s (Invista's) shipment of special yarn used by plaintiff Key Safety Systems, Inc.

(KSS) to manufacture airbags.  KSS asserts that the parties are contractually bound to

a "requirements" agreement by which Invista is to provide specially manufactured yarn

at a set price.  KSS claims that Invista unilaterally increased its price 5 percent and

threatens to terminate deliveries unless the higher price is paid.  KSS represents that

unless deliveries of the yarn continue unabated, it will be unable to honor its

commitment to the car manufacturers, and catastrophic results, such as shutting down

production lines will follow.  Invista, on the other hand, claims that the only enforceable

contracts between the parties are "spot purchases" arising from order to order at prices

it adjusts from time to time.  On May 6, 2008, this Court entered a stipulated temporary

restraining order requiring Invista to continue to supply KSS with the airbag yarn at

issue and requiring KSS to pay the last quoted price for the yarn.[1]  KSS's payment of

the increased price was deemed to have been made "under protest" and "without

prejudice."

Now before the Court is KSS's motion for preliminary injunction in which it seeks

to require Invista to comply with the terms of the alleged requirements contract by

supplying KSS with all of the airbag yarn it needs at a fixed price.  Invista opposes the

motion on the grounds that no requirements contract exists and it is free to increase its

prices from purchase order to purchase order.  After a five-month discovery period, the

Court heard oral argument on September 4, 2008.  For the reasons stated on the record

and below, KSS's motion for a preliminary injunction shall be granted in part and denied

in part.

BACKGROUND

A.    <u>The Parties</u>

KSS manufactures automotive components including airbags which it supplies to

several major automobile manufacturers including Chrysler, L.L.C., Ford Motor

Company (Ford), and General Motors Corporation (GM) and others (collectively the

Original Equipment Manufacturers or OEMs).  KSS is a Delaware corporation with its

principal place of business in Sterling Heights, Michigan.  Invista is a Luxembourg

corporation in the business of supplying airbag yarn.  At oral argument, Invista's counsel

represented that Invista is the largest polymer business in the world.

---

[1]On August 27, 2008, Invista filed a motion for a relief from this Court's May 6, 2008 order.  Invista argues that the prices of raw materials have risen dramatically and it requests that the Court modify the May 6, 2008 order to allow it to increase its prices by approximately $0.26 per pound.  Oral argument shall be heard on that motion forthwith.

B.    Contracts in the Automotive Industry

According to KSS, its airbag assemblies are complex and require a long development cycle to be certified.  Given this context, assured sources of supply are critical to KSS and to its customers, the OEMs.  KSS alleges that the automotive industry operates on a "Just in Time" inventory control system in which goods are manufactured and shipped to OEMs just before they are actually required.  KSS maintains that almost all business in the automotive industry is conducted on a "requirements" basis, in which releases are issued only for the minimum necessary anticipated volume of goods required to fill vehicle orders which the OEMs receive from their dealers.  KSS uses the same type of requirement contracts with its suppliers.  If a supplier of KSS threatens to cut off shipments if a price increase is not granted, KSS is in the position of being forced to shut down its assembly operations which in turn, could force an OEM to shut down as well due to the unavailability of substitute goods.

C.    The Alleged "Requirements" Contract

The parties agree that they had an earlier long term requirements contract that expired on December 31, 2006.  According to KSS, as the parties negotiated a new requirements contract, they entered into two interim requirement contracts.  KSS alleges that after months of intense negotiations, it entered into a long term requirements contract on August 2, 2007, by which Invista agreed to supply 100 percent of KSS's requirements for certain airbag yarns at fixed prices until the end of 2010.  It is undisputed that no written agreement was signed by the parties.  The alleged requirements contract provides that it may be accepted "by signing the purchase order or by beginning work thereunder."  (Doc. 5, Exhibit 1 at ¶2).  KSS maintains that Invista

accepted the contract by shipping goods on at least 34 separate occasions.  Invista, on

the other hand, alleges that with each shipment, it submitted a counter-offer which

offered to supply the airbag yarn at Invista's prices and pursuant to Invista's Terms and

Conditions.  KSS admits that it received these counter-offers, but argues that they are

invalid, in part, because they were sent to a low level employee.  KSS relies on an e-

mail sent from Jeanette Deeb, its Commodities Manager, to Mark Delaplane, Invista's

Global Business Director for nylon industrial specialties business, which it claims shows

that fixed prices were made part of the alleged requirements contract.  (Doc. 25, Exhibit

31).  That e-mail states, "[p]lease see attached.  This p.o. [purchase order] reflects the

prices that went into effect Aug. 1, 2007."

At oral argument, Invista described its nylon as a petroleum based product; thus,

its costs of raw materials are increasing dramatically.  For this reason, Invista wanted

price flexibility and allegedly would not agree to a fixed-price requirements contract.

Invista has submitted the affidavit of its North American Sales Manager, Richard

Grayson.  (Doc. 6, Exhibit 11).  In his affidavit, he states that there was never an

agreement that prices would remain fixed until December 31, 2010.  Id.  He states that

at all times Invista supplied on a "spot" basis and the parties' course of conduct was

consistent with a "spot" relationship.  Id.  In addition, Invista relies on the affidavit of Mr.

Delaplane stating that negotiations for a requirements contract broke down when KSS

would not agree to a raw material escalation/de-escalation clause to protect Invista from

increases in raw material prices.  (Doc. 26, Exhibit 2 at ¶ 12).  Invista also relies on the

deposition testimony of KSS's alleged lead negotiator of the contract, Mike Maloney.

He testified that KSS and Invista disagreed over whether Invista could have a raw

materials price escalation/de-escalation clause put into the contract.  (Doc. 26, Exhibit 4 at p. 20).  Maloney further testified that no agreement had been reached when he resigned from KSS on July 29, 2007.  (Doc. 26, Exhibit 4 at pp. 16-17).  Invista also relies on the deposition testimony of KSS Vice-President for Global Procurement, Steve DuBac, who testified that after Maloney left KSS, and prior to the issuance of the August 2, 2007 Purchase Order 9794, there were no substantive negotiations between the parties.  (Doc. 26, Exhibit 5 at p. 104).

Invista claims that it initiated each transaction with KSS by way of a letter stating that airbag yarns are sold pursuant to Invista's Terms and Conditions and enclosing Invista's prices.  In response to this letter, Invista claims that KSS would send a blanket purchase order named as Purchase Order and Requirements Contract for Order Number 9794.  Invista claims that it never acknowledged receipt or acceptance of Purchase Order 9794.  Invista claims that after KSS sent the Purchase Order, which claimed to be a requirements contract, KSS sent a delivery schedule and release, referring to Purchase Order 9794 and setting forth the quantities to be purchased.  KSS admits that Invista then sent order responses which specifically rejected KSS's order but offering to sell the items set forth in KSS's delivery schedule and release on Invista's own terms.  In sum, Invista claims that it never entered into a "requirements" contract with KSS and that the parties always operated on a contract-to-contract basis.  Invista claims that the parties operated on a Purchase Order-Release-Response to Purchase Order-Release-Response basis.  (Doc. 6, Exhibit 11).

Under the alleged "requirements" contract, Invista is allegedly required to supply three types of nylon yarn used by KSS to weave the fabric cushion of KSS's airbag

5

assemblies.  The fabric cushion is that part of the airbag which actually contacts a passenger's body during a crash.  The alleged requirements contract between KSS and Invista is also known as an "Evaluated Receipt Settlement" (ERS) contract.  Under the ERS contract, KSS pays for yarn supplied by Invista within 25 days after it receives the yarns.  According to KSS, the contract provides for this and the parties conducted business in accordance with those terms.

KSS entered into requirements contracts with Chrysler, Ford, GM, and Hyundai for the manufacture of airbag assemblies for installation in 31 different vehicles. Without the yarn supplied by Invista, KSS alleges that it cannot make any of the airbag assemblies.  Because of its requirements contracts with the OEMs and the "just in time" supply practices prevalent in the automotive industry, KSS does not keep a substantial inventory of airbag assemblies on hand.  Without the yarn from Invista, KSS claims that it cannot manufacture the airbag assemblies and the OEMs likewise will not receive those airbags for installation in their vehicles.  Without the airbags, the vehicles fail to meet federal, Canadian and European motor vehicle safety standards, so the vehicles could not be sold in the United States, Canada, or Europe.  All of KSS's contracts with the OEMs are fixed price contracts.

Invista maintains that it never agreed to any requirements contract and that any sale of the airbag yarns was always on a "spot" purchase basis.  In further support of this argument, Invista has attached a letter from Mark Delaplane of Invista to Mike Maloney of KSS dated June 4, 2007 in which Invista sets forth current prices for the yarns and states that the prices are "subject to change without prior written notice and at INVISTA's sole discretion."  (Doc. 6, Exhibit 4).  That letter further provided that any

binding agreement regarding sale had to be pursuant to a Sales Agreement satisfactory to Invista with an acknowledgment that Invista's standard Terms and Conditions applied.

Invista argues that it repeatedly rejected KSS's attempts to enter into a "requirements" contract. Every time KSS attempted to place an order that referenced a requirements contract, Invista issued an order response stating, "Unable to accept your order, however, we are able to offer the Products on the following terms." The order response then set forth the product description, quantity and price. (Doc. 6, Exhibit 2). It also states that "INVISTA's Terms and Conditions of Sale on the following pages are incorporated by reference and apply to this Offer." Id. The Terms and Conditions provide that an order response constitutes an "offer of sale of Invista" and that KSS can accept by purchasing or taking delivery of the product. (Doc. 6, Exhibit 3).

Invista claims that each time it delivered airbag yarn to KSS it rejected KSS's offer - which referenced the requirements contract - and put forth its own counter-offer by way of its order responses. In this way, Invista argues that it consistently rejected KSS's attempts to operate under a requirements contract and the parties operated under a contract-to-contract basis. KSS rejects Invista's theory of the parties' agreement. It points out that Invista never directed any objection to the requirements contract to KSS's headquarters, its management, or its purchasing department. KSS argues that it did not submit "purchase orders" to Invista, but only "releases," which are shipping instructions. KSS also complains that Invista's alleged counter-offers or order responses were merely computer-generated forms that were e-mailed from a low level Invista order clerk to a low level employee at KSS's Knoxville factory. Invista, however,

disputes that the alleged counter-offers were sent to low level employee. Its alleged counter-offers were sent to Tim Patterson, Manager of KSS's Textiles Product Unit in Knoxville, Tennessee where the goods were shipped. KSS does not dispute that Patterson told Mary Jane Thompson, Invista's customer service representative at Invista's Chatanooga, Tennessee facility, to send the order responses to him.

KSS argues that Invista's computer-generated forms were so routinely meaningless that Invista attached the same order response to its shipment of free samples to KSS. At oral argument, Invista responded that the free samples required the order responses to ensure that its Terms and Conditions controlled, in the event, that for example, its warranty provisions should be implicated. KSS maintains that the reality of the parties' transactions was an over-arching, multi-year fixed-price "requirement contract" which the parties negotiated for the better part of a year and to which Invista not only failed to formally reject, but accepted by shipping goods no less than 34 times in five months. KSS does not dispute that Invista never signed a "requirements" contract and never shipped airbag yarns to KSS without attaching an "order response" or alleged counter-offer.

In support of its argument that a requirements contract exists, KSS has submitted the affidavit of its Commodity Manager Jeanette Deeb who states that between August 2, 2007 and December 31, 2007, Invista made 34 shipments of yarn to KSS under the requirements contract executed by KSS on August 2, 2007. According to her affidavit, Invista never communicated any objection to KSS's headquarters or Purchasing Department. She further testifies that Invista e-mailed automated "order responses" to a low level employee at its Knoxville plant who lacked actual or apparent authority to

negotiate or agree to contracts on KSS's behalf. She further states that all of Invista's order responses were to mere "releases," which are shipping instructions only, and not a purchase order or contract.

D.    The Alleged Breach

On January 7, 2008, Richard Grayson of Invista wrote to Deeb and told her that as of February 1, 2008, Invista was increasing prices for the airbag yarn. Invista claims that staggering increases in raw material and energy costs required that it increase its prices. (Doc. 26, Exhibit 2 at ¶ 20). According to Invista, the price increase was in accordance with market rates and was approximately five percent higher than its previous price. Id. at ¶ 21. Deeb wrote back that KSS could not accept the price increase as the requirements contract did not allow for it and its contracts with its customers did not allow it to pass increases on to them. Representatives from KSS and Invista met by teleconference on January 25, 2008 to discuss Invista's demand for increased prices. KSS rejected the price increase and asked Invista to honor the requirements contract. Invista representative Mary Jane Thompson declined the request and threatened to stop shipping any yarn in response to KSS's "releases."

This lawsuit followed. KSS originally filed suit in Macomb County Circuit Court. Invista removed the action on the basis of diversity jurisdiction. An ex parte temporary restraining order was entered in state court. After a telephonic hearing in which both parties appeared, this Court amended that TRO and extended it. Pursuant to that order, Invista was required to continue supplying KSS with airbag yarns and KSS was required to pay the last quoted price for the yarn. The payments are deemed to be made under protest and without prejudice.

9

E.   The Complaint

KSS has filed a five-count complaint against Invista.  The complaint was originally filed in Macomb County Circuit Court but defendant removed on the basis of diversity of citizenship.  Count I of the complaint seeks injunctive relief that Invista be ordered to manufacture and deliver specially manufactured yarns to KSS in response to releases issued by KSS.  Count II seeks declaratory relief that the Court declare that KSS is not in breach of the long term fixed price requirements contract.  Count III alleges breach of contract by Invista for threatening to cease shipping airbag yarns.  Count IV alleges tortious interference with contract.  Count V alleges tortious interference with prospective business relationship.

STANDARD OF LAW

In determining whether to issue a preliminary injunction, the court must consider four factors:(1) whether the movant has shown a strong or substantial likelihood of success on the merits, (2) whether irreparable harm will result without an injunction; (3) whether issuance of a preliminary injunction will result in substantial harm to others; and (4) whether the public interest is advanced by the injunction.  Abney v. Amgen, Inc., 443 F.3d 540, 547 (6th Cir. 2006) (citations omitted).  These four considerations are "factors to be balanced, not prerequisites that must be met."  Certified Restoration Dry Cleaning Network v. Tenke Corp., 511 F.3d 535, 542 (6th Cir. 2007) (citations omitted).  The decision of whether or not to issue a preliminary injunction lies within the sound discretion of the district court and will not be overturned on appeal unless the court relies on clearly erroneous findings of fact, or when the court improperly applies the law.  CSX Transp., Inc. v. Tennessee State Bd. of Equalization, 964 F.2d 548, 553 (6th Cir.

1992).

A plaintiff must always show irreparable harm before a preliminary injunction may issue. Friendship Materials, Inc. v. Michigan Brick, Inc., 679 F.2d 100, 104 (6th Cir. 1982). "The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." Sampson v. Murray, 415 U.S. 61, 88 (1974) (citations omitted). The primary purpose of a preliminary injunction is to maintain the status quo until a decision on the merits can be made. University of Texas v. Camenisch, 451 U.S. 390, 395 (1981). The court is to be flexible in its consideration with each leg of the test balanced against and among the others. In re DeLorean Motor Co., 755 F.2d 1223, 1229 (6th Cir. 1985).

ANALYSIS

A.    Likelihood of Success on the Merits

In deciding whether or not to grant injunctive relief, the first question for the Court to consider is the plaintiff's likelihood of success on the merits. In order to prove a likelihood of success on the merits, KSS needs to show a probability that it had a valid requirements contract with Invista. The evidence on this issue is contradictory. It is beyond dispute that there is no signed requirements contract. There also is no dispute that Invista always responded to KSS's Purchase Order and Releases with its own "order responses" which Invista claims constitute counter-offers. This case presents the Court with a battle of the forms. For the reasons stated below, there appears to be a genuine issue of fact as to whether a "requirements" contract or "spot" contracts exist. The scales do not tip heavily in favor of KSS. Having failed to show a strong likelihood of success on the merits, this prong of the four-part analysis does not favor the granting

11

of injunctive relief.

KSS set forth the alleged "requirements" contract in Purchase Order 9794 dated August 2, 2007 and setting forth an expiration date of December 31, 2010.  (Doc. 6, Exhibit 5).  The Purchase Order provides:

> Unless otherwise specifically provided in this purchase order, buyer shall purchase and supplier shall supply 100% of buyer's requirements for the parts described in this purchase order for the term of this purchase order.

(Doc. 5, Exhibit 1).  The contract also provides that it may not be modified by Invista without KSS agreeing to any change in writing.  Invista does not claim, however, to have modified the contract, but to have rejected it outright and put forth its own counter-offer.

KSS argues that Invista's Order responses could not constitute counter-offers for several reasons.  First, KSS argues that the requirements contract forbids modifications to the contract unless they are in writing and signed by KSS.  The problem with this argument is that it assumes a valid "requirements" contract is in place.  As noted earlier, no signed requirements contract exists.  KSS argues that Invista accepted the requirements contract by supplying it with airbag yarn in response to the Purchase Order and releases.  Each time that Invista supplied KSS with its yarns, however, it included "order responses" which unequivocally state, "Unable to accept your order, however, we are able to offer the Products on the following terms."  (Doc. 6, Exhibit 2).

KSS does not deny that Invista always sent the above-quoted counter-offer but argues that the "order responses" are invalid counter-offers because they were e-mailed to a low level KSS employee who lacked the actual or apparent authority to bind the company.  Invista point out, however, that it mailed its order responses to the person

12

designated by KSS as the person to receive shipments, namely, Tim Patterson, who was the manager of Key Safety's Textiles Product Unit in Knoxville, Tennessee - the same place where Invista shipped the airbag yarn at issue. KSS argues that Invista was required to sent its "order responses" to KSS's headquarters or purchasing department. KSS seeks to rely on <u>Garey v. Kelvinator Corp</u>. 279 Mich. 174, 192 (1937) in support of that proposition. That case is inapposite. It does not involve written offers or counter-offers at all, but addressed the question of whether a director of a corporation, speaking about a past transaction, can bind his company. KSS has failed to show that mailing a counter-offer to an employee of a corporation, where that employee has been designated as the person to receive shipments, does not constitute a valid counter-offer.

KSS also argues that Invista never effectively rejected the "requirements" contract because it objected to mere "releases" or descriptions of the quantity to be ordered. Those releases were always sent with Purchase Order 9794. Because Invista has raised a question as to whether it ever accepted Purchase Order 9794, there is a question of fact as to whether a "requirements" contract even exists.

KSS cites to two cases to support its argument that Invista did not reject the requirements contract itself, but only objected to mere releases. <u>Advanced Plastics Corp. v. White Consolidated Indus.</u>, 828 F. Supp. 484, 486 (E. D. Mich. 1993), <u>aff'd</u>, 47 F.3d 1167 (6th Cir. 1995) and <u>Precision Rubber Prod. Corp. v. George McCarthy, Inc.</u>, 872 F.2d 187, 188 (6th Cir. 1999). KSS is correct that these two cases distinguish releases, or written instructions such as shipping schedules, from valid contracts. <u>Advanced Plastics</u> did not involve a requirements contract, only blanket purchase

orders and releases.

In Precision Rubber, defendant manufacturing representative solicited business for plaintiff from various automotive manufacturers. Id. at 187. Customers placed purchase orders, agreeing to purchase a fixed percentage of their requirements for a given period of time at a specified price upon the acceptance of the terms and conditions of the offer. Id. Plaintiff issued its acceptance of the purchase orders in the form of an "acknowledgment" which it returned to the customer. Id. By contrast, in our case, there is a genuine issue of material fact as to whether Invista issued an "acknowledgment," or otherwise accepted, Purchase Order 9794. In Precision Rubber, defendant sought commissions on all customer purchase orders received and acknowledged by plaintiff within 60-days of his termination date if the products were shipped within one-year subsequent to his termination. Id. at 188. The trial court erroneously held that the defendant was only entitled to the commission if both the purchase order and the release had been executed within 60-days of his termination. Id. at 188. The Sixth Circuit ruled that the trial court erred in holding that a valid contract could not arise until a release (shipping instruction) had been executed. Id. The Sixth Circuit explained that the trial court needed to consider each customer's offer to purchase, and plaintiff's respective acceptance through acknowledgment to determine when a valid contract arose. Id. at 189. Here, KSS argues that Invista accepted the requirements contract based on its performance, i.e. the shipment of airbag yarns, and that Invista only objected to mere "releases." But there is no dispute that with each shipment, Invista included what purported to be a counter-offer and rejection of Purchase Order 9794. The question here is not whether Invista rejected mere releases,

14

however, but whether it rejected Purchase Order 9794 which purports to set forth the parties' requirements contract.

Invista relies on <u>Ralph Schrader, Inc. v. Diamond Int'l Corp.</u>, 833 F.2d 1210 (6th Cir. 1987) for the proposition that its order responses included an express rejection of KSS's offer constituting counter-offers. <u>Schrader</u> involved a conditional acceptance, not an express counter-offer as alleged here, but this Court finds its rationale applicable to the instant dispute. In that case, a buyer offered to purchase aerosol cans from a seller via a purchase order. The seller responded to the buyer's purchase order with an acknowledgment stating that "[t]he terms set forth on the reverse side are the only ones upon which we will accept orders: These terms supersede all prior written understandings, assurances and offers." <u>Id.</u> at 1213. The acknowledgment also provided that the seller would only accept on its terms and that the buyers were to advise immediately if anything in the acknowledgment form was objectionable. <u>Id.</u> The Sixth Circuit ruled that the seller conditioned its acceptance on the terms set forth in its acknowledgment but that it was a question of fact as to whether or not the buyer assented to the terms presented in the conditional acceptance. <u>Id.</u> at 1215. The seller argued that the fact that the buyer accepted and paid for the aerosol cans delivered by the seller demonstrated the buyer's implicit acceptance of the seller's terms. <u>Id.</u> The Sixth Circuit ruled that acceptance was a question for the trier of fact and thus, ruled that the lower court's grant of summary judgment was improper. <u>Id.</u>

By way of analogy, Invista argues that like the seller in <u>Schrader</u>, it made it clear that it was attempting to create a contract only on its terms. Its order responses stated that they "could not accept" KSS's orders, but offered to sell to Key subject to its Terms

and Conditions.  Its Terms and Conditions state that along with the order response, they are to be "deemed an offer of sale by Invista."  (Doc. 6, Exhibit 3, ¶ 1).  Thus, Invista argues it has shown that it made a valid counter-offer which KSS accepted by taking delivery of and making payment for Invista's airbag yarns.  Of course, in ruling on KSS's motion for preliminary injunction, this Court does not decide the ultimate questions of whether Invista made a valid counter-offer and whether KSS accepted that counter-offer.  Questions of fact remain as to whether Invista's order responses were issued in response to the purchase order or to releases.  (Doc. 4, Affidavit of Jeanette Deeb ¶ 6).[2]

Invista further argues that even if this Court rejects its argument that its counteroffer was accepted by KSS via performance, UCC 2-207(3) still precludes the formation of a requirements contract.  Section 2-207(3) provides that "the terms of the contract shall consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any of the provisions of [the UCC]."  Invista argues that since the parties failed to agree on an expiration date, UCC 2-309(2) dictates that "[w]here the contract provides for successive performances but is indefinite in duration, it is valid for a reasonable time but unless otherwise agreed may be terminated at any time by any party."  Under this provision, Invista argues that no requirements contract exists.

---

[2]Invista argues that in the event that this Court should reject its argument that its order responses constituted conditional acceptances under UCC 2-207(1) or counteroffers, then this Court must apply the United Nations Convention on the International Sale of Goods (CISG), 19 I.L.M. 671 (May 1980).  Invista's Terms and Conditions, however, specifically opt-out of the CISG.  Because this Court has found that a genuine issue of fact exists as to whether Invista made conditional acceptances, the Court does not reach the question of whether the CISG bars formation of a requirements contract in this case.

Finally, Invista claims that it could not have a requirements contract with KSS because KSS has other airbag yarn suppliers. Specifically, it names Solutia, an American supplier, Polyamide High Performance, a German Company with a plant in Alabama, and Hyosung, a Korean Company that produces yarn in Korea. (Doc. 6 at 22). It is unclear how these allegations are supported by affidavit or otherwise. Nevertheless, the Court considers the allegations as they are made under penalty of Rule 11 sanctions. The allegation that KSS is receiving airbag yarns from other suppliers is one more factor against finding that KSS is likely to prevail on its breach of contract claim.

In further support of its argument that the "order responses" are invalid, KSS argues that parties to a requirements contract must act in "good faith." MCL § 440.2306(1). KSS argues that Invista's policy of automatically sending out "order responses" with each shipment of airbag yarn indicate that Invista never intended to be bound by the requirements contract. Indeed, this does appear to be the case as Invista disputes that it ever entered into a requirements contract and clearly never signed such an agreement. KSS argues that Invista entered into the requirements contract fraudulently with no intention of performing it and that this is evidence of bad faith and unmerchantable conduct. Once again, this argument depends on a finding that Invista entered into a requirements contract at all, which remains very much in dispute.

KSS also argues that the Invista terms attached to their "order responses" do not contain any pricing language nor do they permit the adjustment of prices in response to market forces. Therefore, KSS argues that even if the "order responses" were valid,

KSS's fixed pricing terms would control.[3]  Invista counters this argument with the affidavit of its North American Sales Manager Richard Grayson.  In his affidavit, Grayson states that Invista initiated each transaction with KSS with a letter which provides that prices are subject to change:

> These prices reflect current market conditions and are subject to change without prior written notice . . . Note that any binding agreement regarding the sale of Product is subject to the execution of a written Sales Agreement Satisfactory to Invista.  Moreover, the prices indicated by this letter as currently in effect are expressly subject to acceptance by you, a the buyer, of Invista's standard Terms and Conditions of Sale.  Any proposal of additional or conflicting terms and conditions by you, as the buyer, may result in a change by Invista, at its sole discretion, of the prices reflected herein.

(Doc. 6, Exhibit 11 at ¶ 10).  Invista relies on Grayson's affidavit that there was never an agreement that prices would remain fixed.  (Doc. 6, Exhibit 11 at ¶ 6-9).  Invista points out that the only reference to fixed pricing until December 31, 2010 is set forth in Key's Purchase Order 9794 which Invista allegedly rejected in its "order responses."  (Doc. 6, Exhibit 11 at ¶ 20).

KSS also argues that the Court cannot require it to pay a higher price to continue receiving the airbag yarn, as the TRO required it to do, as such an order amounts to rewriting the contract to substitute a new price term for an existing price term.  Once again, KSS's argument depends on the existence of a valid requirements contract. Whether or not such a requirements contract exists remains very much in dispute in this

_____

[3]KSS cites MCL § 440.2207(3) for the proposition that where the parties have established a contract by their conduct, the terms of that contract are those terms on which the writings of the parties agree.  KSS claims that its Pricing provisions set forth in the Standard Purchase Order Terms and Conditions control since the terms attached to Invista's order responses do not contain any contrary pricing language (Doc.1, Exhibit A at ¶ 30, p. 4).

lawsuit.  KSS argues that an order requiring it to pay more for the airbag yarn would be unfair as it would reward the breaching party.  KSS argues that as the non-breaching party it bears the risk of Invista's potential future insolvency.  Should such insolvency take place, KSS's ability to recoup its alleged excessive payments may be elusive.  The Court does not find this argument to be persuasive as there is no evidence to suggest that Invista is at any risk of insolvency, or that, if an overpayment is later found to have been made, that it will be incapable of repaying the amounts owing.

Given the disputed facts as to whether or not a requirements contract or spot contracts exist, the Court does not find that KSS has demonstrated a strong probability of success on the merits.  This is not to say that KSS has not submitted some evidence in support of its claims, but that evidence has not yet demonstrated a high likelihood of success on the merits insofar as the first factor of the preliminary injunction standard is concerned.

Among the many possible outcomes of this dispute, is a conclusion that the parties have agreement on a requirements contract; but in the absence of an agreement for a fixed price, the fact finder determines the price by protecting Invista against escalating materials cost and KSS against unwarranted increases.

B.      Irreparable Harm

KSS argues that it would be irreparably harmed if Invista is not ordered to continue to supply it with airbag yarn because it cannot obtain those special yarns elsewhere.  It needs those yarns to make no less than 31 airbags for 31 different vehicles.  KSS maintains that it would take six to nine months to qualify and certify a replacement supplier under the elaborate automotive safety procedures.  Moreover, the

decision of whether or not to accept a replacement supplier lies with the OEMs, not KSS. KSS needs the special yarn immediately because of the automotive industry's "just-in-time" inventory system since it does not have enough yarn on hand to keep up with its requirements contracts with the OEMs. KSS argues that it cannot "cover" or "mitigate its damages" as defined by the UCC, MCL § 440.2712, by purchasing the airbag yarn from another supplier as no such source exists. Invista does not dispute this argument. Indeed, for its part, Invista has repeatedly stated that it stands ready and willing to continue to fulfill all of KSS's yarn needs.

Invista counters that KSS need not be irreparably harmed as long as it goes along with Invista's new pricing scheme. Invista argues that any damages present here are money damages which are quantifiable easily. In fact, the parties entered a stipulated temporary restraining order by which Invista agreed to continue supplying KSS with the airbag yarn at issue at Invista's last quoted price although KSS does so "under protest" and "without prejudice."

Invista argues that even a total business shut-down is insufficient to constitute irreparable harm. In support of this argument, Invista cites Acorn Building Components v. Local Union No. #2194 of the Int'l Union, 164 Mich. App. 358, 366 (1987). That case does not support Invista's argument on the facts of this case. Acorn Building Components involved a labor TRO which regulated picketing. Id. at 365. The Court of Appeals ruled that the TRO was improvidently granted because the police were able to deal with any illegal strike activity and were able to clear the way for egress to the plant. Id. at 366. In that case, plaintiff argued that the illegal strike activity might shut down its plant, but the Court of Appeals noted that economic injuries are not irreparable and may

20

be remedied at law.  Id.  The difference here is that the economic injuries at stake go beyond economic injury to KSS.  KSS has represented that if it does not receive the airbag yarns at issue, it will be unable to supply airbags for 31 different vehicles to major automotive manufacturers, including Chrysler, Ford and GM, among others, and could lead to plant shutdowns.  Based on the automotive industry's safety standards, Invista argues that it could take as much as six to nine months to certify replacement suppliers.  Such a delay would likely lead to OEM plant shutdowns, the results of which could be calamitous to KSS, to the automotive industry, and to the State of Michigan, which is already in a depressed economic state.

Invista also relies on Judge Edmund's recent decision in Eberspaecher North America, Inc. v. Van-Rob, Inc., 544 F. Supp. 2d 592 (E.D. Mich. 2008).  In that case, the defendant sold mufflers to the plaintiff, who manufactured exhaust systems that it, in turn, sold to Chrysler.  Id. at 593.  Much like in our case, the parts supplied by the defendant were specifically engineered and custom-made to meet plaintiff and Chrysler's industry-specific engineering specifications.  Id. at 593.  Plaintiff argued the contract required that the mufflers be supplied at a fixed price while the defendant claimed it had the right to increase prices based on increased costs of alloy surcharges and the exchange rate.  Id. at 596-97.  The plaintiff argued that a preliminary injunction was proper because damages were an inadequate remedy.  Plaintiff claimed that without the injunctive relief, it would lose its sole source of supply for unique automotive parts.  Id. at 601.  Without the mufflers, plaintiff would be unable to produce its exhaust systems which would not only idle its 200 workers but threatened to shut down Chrysler's Brampton Assembly Plant in Ontario.  Id.  Judge Edmunds found that each of

these problems could be averted if the plaintiff paid the increased prices and pursued a breach of contract action against the defendant for money damages.  Id. at 603.  Thus, the court denied plaintiff's request for injunctive relief.  Id. at 604.

To the extent that Judge Edmund's decision is persuasive authority, it is distinguishable on the facts presented here.  The instant dispute involves the manufacture of airbags which are a unique product relating to passenger safety.  Because safety is at issue, the airbags are subject to rigorous testing and certification procedures which last six to nine months.  KSS argues that it would be "economic suicide" to try to locate another supplier given the complicated and lengthy process for certification of airbags.  Were KSS even to request that the yarns of another supplier be approved by its OEMs, KSS alleges that it risks losing it good will and business relations with those customers.  Moreover, using another supplier would require it to re-qualify 31 different vehicle airbags.  Given these circumstances, KSS's risk of irreparable harm is much greater that the risk at issue in Eberspaecher.

KSS also argues that specific performance is warranted because of the unique nature of the airbag yarns at stake.  MCL § 440.2716 authorizes specific performance as a remedy for breach of a sales contract involving unique goods.  It provides:

> Specific performance may be decreed where the goods are unique or in
> other proper circumstances.

Id.  The comment to UCC § 2-716 provides that specific performance may be warranted where a requirements contract is involved or where the goods cannot be covered elsewhere:

> In view of the Article's emphasis on the commercial feasibility of
> replacement, a new concept of what are "unique" goods is introduced

22

under this section.  Specific performance is no longer limited to goods
which are already specific or ascertained at the time of contracting.  The
test of uniqueness under this section must be made in terms of the total
situation which characterizes the contract.  Output and requirements
contracts involving a particular or peculiarly available source or market
present today the typical commercial specific performance situation, as
contrasted with contracts for the sale of heirlooms or priceless works of art
which were usually involved in the older cases.  However, uniqueness is
not the sole basis of the remedy under this section, for the relief may also
be granted "in other proper circumstances" and an inability to cover is
strong evidence of "other proper circumstances."

Id.  Under the UCC, specific performance is appropriate where the unique nature of the

goods makes cover impossible or where a requirements contract is involved.

Finally, KSS argues that the entry of a preliminary injunction which orders KSS to

pay a higher price than that set forth in the alleged requirements contract is highly

prejudicial in that Invista could allegedly seek a 200 percent or even a 15,000 percent

price increase.  Left unchecked, KSS argues that there is no limit to the number of times

that Invista might raise prices, thus, threatening to push KSS into insolvency.  KSS's

argument lacks merit as the Court very carefully drafted the TRO to set the price at the

"last quoted price."  The preliminary injunction to be entered here will contain the same

narrow language which protects KSS from Invista raising its prices unreasonably and

Invista from escalating materials costs.

KSS has made a strong showing of irreparable harm if injunctive relief is not

granted as it will be effectively estopped from producing airbags and from keeping up

with its contractual obligations to the OEMs.   Unless KSS continues to purchase airbag

yarns from Invista, it will be unable to perform under its requirements contracts with the

OEMs.  Invista argues that KSS will not be irreparably harmed so long as it pays the

higher prices and receives the airbag yarns, and that any damages arising from this

arrangement are monetary only. The Court finds this argument persuasive, at least to the extent that Invista does not raise its prices to such an extent that KSS faces the risk of insolvency. Accordingly, this court will narrowly tailor the preliminary injunction entered here to protect KSS from unreasonable price increases. Although Invista claims to remain willing without court order to supply all of KSS's need, the nature of this dispute and drastic consequences of withholding deliveries counsel in favor of court ordered protection.

C.     Harm to Others

In deciding whether or not to grant injunctive relief, this Court must consider any harm to others which will be impacted if the injunction is entered or not. Invista argues that it would be harmed by the entry of an injunction because it would be forced it into a contract which it has not accepted. KSS argues that without injunctive relief, the OEMs will not be able to receive the airbags they need, will not be able to manufacture vehicles without them, and may be forced to shut down plants. As noted, such a result would harm the employees of the OEMs and further damage Michigan's failing economy. Considering the very palpable damage to third-parties if the injunction is not entered weighs in favor of granting injunctive relief.

D.     Public Interest

Finally, the Court considers whether the public interest will be served by the entry of a preliminary injunction. Invista argues that an injunction would not serve the public interest as it would be forced into a contract which it has not accepted. Invista has not argued, however, that it is unable to deliver the airbag yarn or that it faces any hardship if it is required to supply the airbag yarns at the higher price. KSS, on the other hand,

argues that compelling Invista to deliver the airbag yarns will avoid consequential plant shutdowns or layoffs, and will avoid other harm to the economy of the state, region and nation.  As to the public interest factor, the scales once again tip in favor of KSS and the granting of injunctive relief.

CONCLUSION

For the reasons stated above, KSS's motion for a preliminary injunction (Doc. 2 and 5) hereby is GRANTED IN PART in that Invista shall continue to supply KSS with the airbag yarn at issue, and hereby is DENIED IN PART in that KSS shall pay Invista's last quoted price as provided in the parties' stipulated temporary restraining order for the airbag yarn.

Invista shall not increase the price it charges for airbag yarn except by further order of this Court.  Upon application to the court for price modifications, the Court will consider same for approval if good cause is shown.

KSS's payment of the increased prices shall be deemed to have been made "under protest" and "without prejudice" to KSS's ability to seek recovery of those increased payments.

SO ORDERED.

Dated:  September 16, 2008

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
September 16, 2008, by electronic and/or ordinary mail.

s/Josephine Chaffee
Deputy Clerk